Irving **SCHWARTZ**, Plaintiff,

v.

Kenneth **APFEL**, Commissioner of Social Security, Defendant.

No. 98 CV 2412.

United States District Court, E.D. New York.

Aug. 30, 1999.

Irving Schwartz, Richmond Hill, NY, pro se.

Loretta E. Lynch, United States Attorney, (Susan L. Riley, Assistant United States Attorney, of counsel), Eastern District of New York, Brooklyn, NY, for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Irving Schwartz brought this action on March 30, 1998 pursuant to 42 U.S.C. § 405(g) to review a final decision of the defendant Commissioner of Social Security that he was not entitled to disability insurance benefits under the Social Security Act.

### I

Plaintiff applied for disability insurance benefits on June 10, 1996 alleging he had been disabled since March 29, 1996 due to loss of vision in his right eye. The application was denied initially and on reconsideration. Plaintiff requested a hearing before an administrative law judge, which was

held on April 7, 1997. At the hearing, Administrative Law Judge Martin K. Kahn informed plaintiff of his right to be represented by an attorney. Plaintiff stated that he could "handle the [case] [him]self" and elected to proceed *pro se.*

In a decision dated July 21, 1997, Administrative Law Judge Kahn found plaintiff was not disabled within the meaning of the Social Security Act. His concluding findings are as follows:

Plaintiff met the disability insured status requirements of the Social Security Act on March 29, 1996, the date plaintiff alleges he became unable to work, and continued to meet them through December 1996. He had not engaged in substantial gainful activity since March 29, 1996. The medical evidence established that he had monocular vision of the right eye and normal vision of the left eye. He did not have an impairment or a combination of impairments listed in, or medically equal to, one listed in Appendix 1, Subpart P, Regulations No. 4.

While plaintiff had medically determinable impairments that could reasonably cause the symptoms he alleged, his symptoms were not of such intensity, frequency, or duration as to preclude all work activity. He had the residual functional capacity to perform the exertional and non-exertional requirements of light and sedentary work not requiring good depth perception.

Plaintiff could not perform his past relevant work as a restaurant manager. He was sixty-four years old when he allegedly became disabled, an age "defined as closely approaching retirement age." Section 404.1569 of Regulations No. 4 and Rules 201.05, Table No. 1 of Appendix 2, Subpart P, Regulations No. 4, direct a conclusion that, considering plaintiff's residual functional capacity, age, education, and work experience, he is not disabled.

Administrative Law Judge Kahn's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on February 19, 1998.

## II

Plaintiff was born in New York City on February 4, 1932 and was sixty-five years of age at the time of the hearing. He has a masters degree in political science from Fordham University. He is divorced and lives alone in a rented apartment.

Plaintiff worked at the same restaurant in Richmond Hill from 1974 to 1996, when he allegedly became disabled. During the administrative hearing, he described his workplace as a "tavern and restaurant" serving mainly a local clientele comprised of factory workers and employees of small businesses in the area. Plaintiff began working as a bartender but was promoted to the position of restaurant manager after three years and worked in that capacity until 1996. As a restaurant manager, plaintiff's responsibilities included ordering food, supervising staff, doing the payroll, and casing checks.

On or about October 1994, plaintiff began to see spots and flashes in front of his eyes. He went to see Dr. Mark Friedman at the Health Insurance Plan of Greater New York, who referred him to Dr. Young Hahn. Dr. Hahn examined plaintiff on October 18, 1994, November 15, 1994, August 9, 1995, and October 3, 1995 and diagnosed him with myopia in both eyes and a stage three macular hole in his right eye. A fluorescein angiogram performed on September 5, 1995 confirmed a full thickness macular hole in the right eye. Plaintiff's left eye was normal except for peripapillary chorioretinal atrophy.

Dr. Friedman also referred plaintiff to Dr. Mark Fromer, a retinal surgeon specializing in diseases and surgery of the retina and vitreous. In a letter dated October 20, 1995 addressed to Dr. Friedman, Dr. Fromer stated that plaintiff "clearly has a macular hole surrounded by a sub-retinal cuff in the right eye." He classified plaintiff's condition as a stage four macular hole. Plaintiff also appeared

to have a posterior vitreous detachment. His visual acuity was 20/250 in the right eye and 20/50 in the left eye. According to a dilated fundus examination, there was evidence of high myopia in both eyes.

Dr. Fromer discussed with plaintiff the benefits and risks of surgical repair. He informed plaintiff that he had a chance of regaining useful vision if the surgical procedure were successful but the risks included retinal detachment and cataract formation. Plaintiff elected not to undergo surgery.

On July 9, 1996 Dr. Friedman filled out a "Notice and Proof of Claim for Disability Benefits" insurance form, where he stated that plaintiff had a macular hole in his right eye and that he was "totally disabled" from March 29, 1996 to the present.

Plaintiff was examined by Dr. Fromer again on November 5, 1996. The doctor diagnosed high myopia with high astigmatism in both eyes. Plaintiff was legally blind in his right eye. But his left eye had "normal vision to the 20/30 level with correction." Dr. Fromer concluded that plaintiff may have difficulty with depth perception and fine eye-hand motor coordination but could carry out some work-related functions with his current eyesight in the left eye.

Plaintiff testified at the administrative hearing that he wanted to work and was, in fact, actively seeking work. As of the date of the hearing, he had applied for a least twenty-five restaurant jobs but had received no responses from prospective employers. Although acknowledging he had no factual basis, plaintiff conjectured that he was at a distinct disadvantage because of his age.

### III

■ The Commissioner's findings of fact are conclusive if free of legal error and supported by substantial evidence. See Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir.1982) (per curiam).

■ The burden of showing disability under the Act is initially on a claimant. Once it is established that the claimant has a severe impairment and lacks the residual functional capacity to perform his past relevant work, the burden shifts to the Commissioner to prove that a claimant could perform other jobs available in the national economy. See id.

In making that determination, the Commissioner must consider a claimant's residual functional capacity, age, education, and past work experience. See 20 C.F.R. § 404.1520(f)(1).

The way in which age is factored into the Commissioner's determination of disability is set forth in 20 C.F.R. § 404.1563. That section states that age "refers to how old you are (your chronological age) and the extent to which your age affects your ability to adapt to a new work situation and to do work in competition with others." Id. § 404.1563(a).

When a person is under fifty years old, age is considered an insignificant vocational factor. See id. § 404.1563(b). But beyond this threshold age, the Commissioner's burden of proof depends significantly on which of the following three age categories a particular claimant belongs in.

If a claimant is between the ages of fifty and fifty-four, the Commissioner must consider that age may affect a claimant's ability to adapt to a new job. See id. § 404.1563(c). For a person of "advanced age," defined by the regulations as ages fifty-five and over, the Commissioner must consider that "age significantly affects a person's ability to do substantial gainful activity." Id. § 404.1563(d). In particular, "if you are severely impaired and of advanced age and you cannot do medium work ..., you may not be able to work unless you have skills that can be used in (transferred to) less demanding jobs which exist in significant numbers in the national economy." Id.

The Commissioner faces the highest burden of proof with respect to a person

"close to retirement age," defined by the regulations as an individual between the ages of sixty and sixty-four. If a claimant who has a severe impairment is in this age category, the Commissioner may not consider that person "able to adjust to sedentary or light work unless [he or she has] skills which are highly marketable." *Id.*

■ Plaintiff was sixty-four years old when he allegedly became disabled and sixty-five years old at the time of the hearing. Thus during all times relevant to the Commissioner's determination of disability, he was a person "close to retirement age." Because plaintiff had a severe impairment, in order to find plaintiff not disabled, the Commissioner had to show he had skills that are not only "transferable" but also "highly marketable."

In order to support a finding of "transferability of skills" when a claimant is sixty years or older, there must be "very little, if any, vocational adjustment required in terms of tools, work processes, work settings, or the industry." Rule 202.00(f), 20 C.F.R. Pt. 404, Subpt.P, App. 2. This is a more stringent standard of transferability than the general one set forth in 20 C.F.R. § 404.1568(d). That section is headed "What we mean by transferable skills" and states in pertinent part, "[W]e consider you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work."

During the hearing, the vocational expert testified that a person with monocular vision who is capable of only sedentary or light work, but possessing the kinds of skills plaintiff had, could work as, among other things, a customer service clerk, information clerk, an interdepartmental messenger, a receptionist, a filing clerk, a clerk who "receiv[es] orders [or] operat[es] a duplicating machine," or a maitre d'.

Plaintiff's past work experience is primarily as a restaurant manager. He tes-

tified that he worked for the same restaurant from 1974 until 1996. Although during the hearing the vocational expert discussed plaintiff's transferable skills, it is not clear from the record that the administrative law judge correctly applied the heightened standard of transferability applicable to claimants approaching retirement age. In fact, Administrative Law Judge Kahn did not discuss at all the issue of transferability in his decision. The record does not show if he considered whether or not the jobs mentioned by the vocational expert would require "very little, if any, vocational adjustment in terms of ... work processes, work settings, or ... industry."

■ Moreover, acquired skills do not transfer to unskilled work, which by definition, requires no skills. *See Terry v. Sullivan,* 903 F.2d 1273, 1277 (9th Cir.1990); *Allen v. Bowen,* 881 F.2d 37, 43 (3d Cir. 1989). Thus, the Commissioner cannot meet his burden of showing that a claimant has transferable skills by identifying unskilled jobs.

Unskilled work is defined by the regulations as "work which needs little or no judgment ... [and] can be learned on the job in a short period of time (30 days)." 20 C.F.R. § 220.133(b). The administrative law judge did not discuss which of the jobs the vocational expert identified involved semi-skilled or skilled work.

The record also shows that the administrative law judge gave no consideration to the issue of "highly marketable skills." The term was never used during the hearing and was not discussed by the administrative law judge in his decision.

■ The regulations do not expressly define "highly marketable skills" and there is no caselaw in this circuit construing the term. Whatever it might mean, it seems clear that it is not synonymous with merely "transferable skills." The structure and language of the regulations make clear that the "highly marketable skills" is a more stringent standard applicable only

when a claimant is sixty years or older. This heightened burden of the Commissioner's reflects the reality that beyond a certain threshold point, age significantly affects an individual's ability to adapt to new work situations, and that it becomes a particularly strong and negative vocational factor as one approaches retirement age.

Sister circuits considering this issue have uniformly held that when a claimant is sixty years or older, the Commissioner must make a specific determination as to whether his or her skills are highly marketable. *See Kerns v. Apfel,* 160 F.3d 464, 469 (8th Cir.1998) (section 404.1563(d) requires "something more than a mere determination of transferability for claimants approaching retirement age."); *Preslar v. Secretary of Health & Human Servs.,* 14 F.3d 1107, 1111 (6th Cir.1994) ("[i]t is evident that 'highly marketable' skills are something more than 'transferable' skills."); *Emory v. Sullivan,* 936 F.2d 1092, 1094 (10th Cir.1991) ("when the claimant is close to retirement age, the Secretary must specifically evaluate the marketability of his skills in deciding whether they are transferable."); *Pineault v. Secretary of Health & Human Servs.,* 848 F.2d 9, 11 (1st Cir.1988) ("[w]ithout a finding that claimant's skills were 'highly marketable' as opposed to just 'transferable,' the vocational disadvantage of claimant's advanced age might not be offset by the existence of transferable skills."); *Tom v. Heckler,* 779 F.2d 1250, 1256 (7th Cir. 1985) (if a claimant is close to retirement age, the regulations do not permit a finding of transferability "[a]bsent a finding that a claimant ... has acquired skills which are also 'highly marketable.' ").

■ The *Random House Dictionary of the English Language* defines "marketable" as "readily salable." If (1) the pool of persons with skills similar to those of a claimant is relatively large, (2) the number of available jobs requiring those skills is relatively scarce, and (3) the claimant is close to retirement age while most in the pool are significantly younger than him,

then that claimant's skills can hardly be considered "highly marketable." The regulations specifically recognize that beyond the threshold age of fifty-five, age functions as a significant, negative vocational factor in that it diminishes one's ability to adapt to new work situations and adversely impacts one's ability to do substantial gainful activity. Given this reality, it is reasonable to expect that if a claimant approaching retirement age has only the same or similar set of discrete vocational skills as a younger individual, but has no additional assets to offset the vocational disadvantages associated with age, potential employees will prefer to hire a younger individual.

■ Thus, implicit in the term "highly marketable skills" is the notion that a person possessing them will be sufficiently coveted by employers so as to offset the vocational disadvantages of advancing age, and that such skills would normally enable the claimant to obtain employment. *See Preslar v. Secretary of Health & Human Servs.,* 14 F.3d 1107, 1112 (6th Cir.1994). The Ninth Circuit has described it as an "edge" a claimant's skills would give him, such that even if his other capacities were diminished due to age, that fact would not be a significant deterrent when competing against significantly younger individuals. *See Terry v. Sullivan,* 903 F.2d 1273, 1279 (9th Cir.1990).

■ It will be difficult sometimes to determine how much of the disadvantage an elderly individual experiences in the labor market is due to legitimate vocational factors and how much is due to discriminatory reasons. Advancing age will, generally speaking, adversely affect one's ability to adjust to new work situations and is thus a legitimate vocational factor. Nonetheless, some adverse hiring decisions are no doubt based on reasons that are merely a pretext to discriminate against elderly people and are at bottom inconsistent with the nation's laws against age discrimination. But the fact that individuals subjected to

such discrimination could seek legal redress by filing lawsuits should not bar those who are otherwise disabled within the meaning of the Act from recovering benefits. Recovery in such cases is eminently consistent with the remedial and beneficent purposes of the Social Security Act. *See generally, Gold v. Secretary of Health, Education, and Welfare,* 463 F.2d 38 (2d Cir.1972).

Possession of "highly marketable skills" may be shown by the fact that a claimant has specialized or extensive training, education, or experience that gives him a tangible advantage in the labor market over younger persons not possessing such a background. Of course, training or education that does not give a claimant an edge in the pertinent job market would not constitute "highly marketable" skills.

The administrative law judge found plaintiff to be a highly educated individual and noted several times that he had a masters degree in political science. But he did not discuss how or why such a degree would make plaintiff more marketable when competing against other individuals in the job markets identified by the vocational expert, for example, the market for maitre d's or customer service clerks.

### IV

The record as developed is inadequate to establish transferability or marketability of skills in light of plaintiff's age. The Commissioner's decision was not supported by substantial evidence.

The decision of the Commissioner is hereby reversed and remanded for reconsideration consistent with this decision.

So ordered.